USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/24/2024

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

               - against -

KEVIN DELVALLE,

               Defendant.

**17 Cr. 314 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

On November 15, 2019, defendant Kevin Delvalle was sentenced to 420 months' imprisonment, after pleading guilty to his leadership role in a gang-related drug trafficking scheme and the related murder of Donnell Harris. Less than two years after sentence was imposed, Delvalle moved *pro se* for compassionate release (see Dkt. No. 159), which the Court denied (see "Order," Dkt. No. 162). Now before the Court is Delvalle's Motion for Reconsideration. (See Dkt. No. 165 [hereinafter "Motion" or "Mot."].) For the reasons explained below, the Motion is **DENIED**.

## I.  BACKGROUND

### A. Factual Background[1]

Delvalle and his co-defendants Denfield Joseph and Paris Soto were Bloods gang members who operated principally in the

---

[1] The following facts are derived from the factual recitation found in the Final Presentence Investigation Report (see "PSR," Dkt. No. 93, ¶ 8-

vicinity of East 173rd Street and Monroe Avenue in the Bronx. From 2009 to 2010, the three men engaged in a conspiracy to sell crack cocaine, marijuana, and ecstasy. Delvalle assumed a leadership role in the conspiracy, supplying the drugs for Joseph and Soto to sell, supervising them, and receiving a larger portion of the proceeds to secure a resupply. Delvalle also supplied Joseph and Soto with the .38 caliber firearm that the trio used to perpetrate a series of armed robberies of people on the street as well as other drug dealers, selling the drugs that they stole.

In March 2010, Delvalle, Joseph, and Soto began spending time with their eventual victim Donnell Harris – usually smoking PCP together and sometimes discussing the robberies. Harris, who at the time was homeless and living on the roof of Joseph's building, repeatedly asked to join them in their robberies, but he was always rebuffed. One day, Delvalle and Joseph robbed a drug customer called "Drop" by selling him chopped up soap disguised as crack cocaine. When Drop discovered the deceit, he reportedly returned with a firearm, looking to retaliate against Delvalle and Joseph. Upon learning of this incident, Harris threatened to tell Drop

---

17), which the Court considered and adopted at sentencing (see Sentencing Transcript, Dkt. No. 150, 31:6-32:20 [hereinafter "Sent. Tr."]).

where he could find Delvalle and Joseph unless they gave him a share of the robbery proceeds.

Spurred by Harris's threat, Delvalle, Joseph, and Soto hatched a plot to kill Harris. The trio originally planned to shoot Harris. On August 31, 2010, they drove Harris to Crotona Park on the pretense that they would commit a robbery together. Soto brought Delvalle's gun; but when they arrived at the park, Soto grew nervous and did not shoot Harris. After leaving the park, the four men drove to Soto's apartment, where they drank and smoked PCP together.

As the night wore on, Delvalle, Joseph, and Soto decided to kill Harris with knives from Soto's kitchen. As Harris began to leave the apartment, the three men suddenly turned on the unarmed Harris in a frenzied attack – stabbing him repeatedly in the head, neck, and torso with kitchen knives and bludgeoning him with cooking pots as he tried to escape. When these attempts to kill Harris failed, they dragged him to the bathtub, where they unsuccessfully tried to drown him. With Harris still fighting for his life, Joseph and Soto wrapped an extension cord around Harris's neck and attempted to strangle him. In the struggle, Harris managed to escape their grasp and ran for the door, but the three men caught him and dragged him back, where Delvalle used the extension cord to strangle Harris to death.

After killing Harris, Delvalle, Joseph, and Soto left the apartment to buy cleaning supplies and returned several hours later with Delvalle's girlfriend, Karina Flores, and Joseph's girlfriend, Luz Maldonado, to dispose of Harris's body. Flores and Maldonado set to work dismembering Harris's body in the living room, using a large knife to cut off Harris's legs, while Delvalle served as lookout outside the apartment and coordinated with them by phone. The men then cleaned the apartment with bleach before wrapping Harris's remains in garbage bags and removing it from the apartment in a shopping cart.

In the early morning hours, Flores and Maldonado wheeled the shopping cart down 180th Street to Webster Avenue, while the men followed closely by car. After briefly entering a gas station convenience store to evade a uniformed police officer, Flores and Maldonado left the cart with Harris's mutilated body on the sidewalk at 4109 Park Avenue, in front of a Salvation Army center. Delvalle then told Joseph and Soto to get rid of the evidence and handed them a container of lighter fluid. At Delvalle's direction, the men doused Harris's body with lighter fluid and set it ablaze, before returning to Delvalle's car. The next day, Delvalle, Joseph, and Soto gathered the bloody clothes left at Soto's apartment, washed them at a laundromat, and placed them in a garbage bag

4

near Crotona Park. They then discarded the knives, pots, and extension cord in a nearby sewer.

Firefighters dispatched to fight the blaze started by Joseph and Soto discovered Harris's dismembered body on September 1, 2010, at 3:52 a.m. An autopsy concluded that Harris's cause of death was strangulation. The medical examiner also found that that Harris had been stabbed at least 33 times - recording over 17 stab and incised wounds to Harris's head and neck, and another 16 stab wounds to the front and back of his torso. Both of Harris's legs had been amputated above the knee, and his body was covered in third-degree burns, all post-mortem.

## B. **Procedural Background**

Delvalle pleaded guilty on November 15, 2019, to narcotics conspiracy in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B), pursuant to a plea agreement. (See Judgment, Dkt. No. 148, at 1.) As a condition of his plea, Delvalle admitted to participating in the murder of Donnell Harris on August 31, 2010, which Delvalle agreed was relevant conduct to the offense of conviction. (See PSR ¶ 3; Plea Allocution Transcript, Dkt. No. 85, 26:4-27:1 [hereinafter "Plea Tr."].) Delvalle stipulated to a Guidelines range ("Stipulated Guidelines range") of 360 to 480 months' imprisonment, as set forth in the plea agreement, with a mandatory minimum term of

60 months' imprisonment and a statutory maximum of 480 months' imprisonment. (<u>See</u> PSR ¶ 3; Plea Tr. 18:22-19:3-12.) On July 8, 2022, Delvalle was sentenced principally to 420 months' imprisonment. (<u>See</u> <u>id.</u> 32:13-20; Judgment at 2.)

Just seventeen months after sentencing, Delvalle moved *pro se* on December 11, 2023, for a reduced sentence under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A) – based, in part, on Amendment 821 to the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), which he claimed retroactively reduced his Guidelines range. (<u>See</u> Mot. at 6-7.) The U.S. Probation Office issued a report indicating that Delvalle is ineligible for a sentence reduction under Amendment 821. (<u>See</u> Dkt. No. 161.) The Court denied Delvalle's request on January 25, 2024, finding that Delvalle was ineligible for a sentence reduction under Amendment 821 for the same reasons identified by Probation. (<u>See</u> Order.) Delvalle moved for reconsideration, asserting that the Court failed to address his other arguments for a sentence reduction. (<u>See</u> Mot. at 1.) The Government filed its opposition on April 16, 2024 (<u>see</u> "Opp.," Dkt. No. 167); and, though the Court granted his request for an extension of time to May 14, 2024, to file a reply (<u>see</u> Dkt. No. 172), Delvalle has not filed a reply to date.

## II.  <u>LEGAL STANDARD</u>

### A. <u>Reconsideration</u>

"The standard for granting a motion for reconsideration is strict and the motion should be granted only when the movant demonstrates an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." <u>United States v. Reese</u>, No. 12 Cr. 629, 2022 WL 7541864, at *1 (S.D.N.Y. Oct. 12, 2022).[2] "The motion for reconsideration must be denied, however, if it merely restates arguments already presented or attempts to advance new facts." <u>Id.</u> "Indeed, reconsideration of a court's previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." <u>United States v. Fishman</u>, No. 20 Cr. 160, 2023 WL 5432263, at *2 (S.D.N.Y. Aug. 23, 2023). Accordingly, "reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." <u>Id.</u>

---

[2] Unless otherwise specified, all internal quotation marks, citations, omissions, alterations, and footnotes are omitted from all cited sources.

## B. **Sentence Reduction**

Section 3582(c)(1)(A) "authorizes the Court to modify a term of imprisonment if it finds that: (1) extraordinary and compelling reasons warrant such a reduction; (2) such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and (3) the § 3553(a) factors weigh in favor of a reduction in sentence." United States v. Sierra, No. 10 Cr. 416, 2024 WL 1834081, at *1 (S.D.N.Y. Apr. 26, 2024). The Guidelines' policy statement sets forth several categories of "extraordinary and compelling reasons" that may warrant a sentence reduction. See id. at 2 (discussing the categories found in U.S.S.G. § 1B1.13 and its commentary). District courts nevertheless "have broad discretion when considering such motions and are free to consider the full slate of extraordinary and compelling reasons that may warrant an imprisoned person's release." United States v. Tavarez, No. 20 Cr. 301, 2024 WL 2958607, at *1 (S.D.N.Y. June 11, 2024). "The only statutory limit . . . is that rehabilitation alone shall not be considered an extraordinary and compelling reason." Id.; see 28 U.S.C. § 994(t); U.S.S.G. § 1B1.13(d). Ultimately, the movant "bears the burden" of showing circumstances that warrant a sentence reduction. Sierra, 2024 WL 1834081, at *3.

### III. <u>DISCUSSION</u>

Here, Delvalle relies on the same arguments he made in his initial motion for compassionate release, which the Court already considered and rejected. Delvalle does not ask the Court to reconsider its determination that Amendment 821 does not apply to him (<u>see</u> Mot. at 1), and the Court finds no reason to disturb that determination here. However, Delvalle contends that the Court erred in addressing only his Amendment 821 argument and not the additional arguments raised in his motion for compassionate release. (<u>See</u> <u>id.</u>) Aside from Amendment 821, Delvalle offered four circumstances that he maintains constitute extraordinary and compelling reasons for a sentence reduction: (1) a purported "sentencing disparity" between his sentence and the sentence he would likely receive under Amendment 821 (Mot. at 7-8); (2) his "youth" at the time of the instant offense (<u>id.</u> at 11-15); (3) his "excessively long sentence" (<u>id.</u> at 15-16); and (4) his "clean disciplinary record" in prison (<u>id.</u> at 8-9). Delvalle further argued that the Section 3553(a) factors also favor a sentence reduction. (<u>See</u> <u>id.</u> at 16-18.)

Because the Order only addressed Delvalle's Amendment 821 argument, the Court now addresses each of those additional circumstances, in turn. But since none entitle Delvalle to

the relief he seeks, his Motion must be denied. See Fishman, 2023 WL 5432263, at *2.

## A. **Extraordinary and Compelling Reasons**

At the outset, the Court finds that there is no sentencing disparity at issue here. Delvalle's argument is premised on the mistaken notion that Amendment 821 would lower his Guidelines range were he to be sentenced today. (See Mot. at 7-8.) But the Court has already determined that Amendment 821 does not affect Delvalle's Guidelines range (see Order) – a determination he does not challenge on reconsideration.

Next, the Court finds that none of Delvalle's remaining circumstances are "extraordinary and compelling." Though a defendant's "age at the time of his crime" and a "an unusually long sentence" may sometimes "weigh in favor of a sentence reduction," "the consideration of these factors and of their possible relevance, whether in isolation or combination, is best left to the sound discretion of the trial court." United States v. Brooker, 976 F.3d 228, 238 (2d Cir. 2020). Here, the Court finds that the gravity of Delvalle's offense cannot be explained by his age; nor is Delvalle's sentence excessively long considering the depraved nature of his

conduct. And without an extraordinary and compelling reason, his rehabilitation alone cannot support a sentence reduction.

First, Delvalle's actions "cannot merely be explained by his youth." United States v. Price, No. 05 Cr. 492, 2023 WL 4850995, at *2 (E.D.N.Y. July 28, 2023). Courts in this District have denied similar motions for compassionate release based on the defendant's age, where the defendant's actions were calculated and deliberate and not the product of duress. See, e.g., id. (finding teenage defendant's conduct as a leader of a violent drug trafficking organization cannot be "written off as youthful folly," but rather reflected "calculated decisions to engage in violent activity"); United States v. Raposo, No. 98 Cr. 185, 2024 WL 165195, at *7 (S.D.N.Y. Jan. 16, 2024) (finding 22 year old defendant "was not under the influence of outside pressure" when he set fire to building resulting in death of responding firefighter, but rather "acted entirely on his own, after deliberation and a degree of planning").

As in those cases, Delvalle's actions were premeditated and deliberate. In addition to gang-related narcotics trafficking and armed robbery, Delvalle admitted to murdering Donnell Harris in a particularly gruesome attack. The record shows that Delvalle played a leading role in orchestrating the murder. (See id. ¶¶ 12-13.) The record also shows that

Harris, who was unarmed and vulnerable, suffered a slow, agonizing death at the hands of those who he thought were his friends. (See id. ¶ 13; Sent. Tr. 6:13-21, 7:3-17.) After all three men stabbed Harris repeatedly in the head, neck, and body, it was Delvalle who finally strangled Harris to death with the extension cord. (See PSR ¶ 13.) The brutality of Delvalle's conduct is underscored by the callous and inhumane manner in which he disposed of Harris's body: enlisting his own girlfriend (the mother of his children) to help dismember Harris's body, before discarding Harris' mutilated remains in the street and directing his accomplices to burn the body in an effort to conceal evidence. (See id. ¶¶ 14-17; Sent. Tr. 8:6-18.) Unlike cases where the defendant's youth was a reason to grant a sentence reduction, Delvalle's actions were "a far cry from a split-second, hot-headed choice of an [adolescent]." Raposo, 2024 WL 165195, at *7.

Delvalle's "relative youth do[es] not explain away the reality that he committed a calculated murder for personal gain." United States v. Glynn, No. 06 Cr. 580, 2022 WL 562652, at *5 (S.D.N.Y. Feb. 24, 2022) (finding 22-year-old defendant's "difficult upbringing and relative youth" did not justify reducing life sentence for murder).[3] Delvalle was 23

---

[3] The court in Glynn nevertheless reduced the defendant's sentence based on two alternative circumstances Delvalle lacks. See 2022 WL 562652, at *6 (crediting defendant's recent diagnosis of chronic kidney disease

years old when he killed Harris – older than the defendants denied sentence reductions in <u>Price</u>, <u>Raposo</u>, and <u>Glynn</u>. <u>See also</u> <u>United States v. Gonzalez</u>, No. 97 Cr. 204, 2021 WL 1990041, at *4 (D. Conn. Apr. 23, 2021) (finding defendant's youth did not warrant reducing life sentence because, at age 24, he was "on the very cusp" of "late adolescence" and in close "proximity to the age of full maturity"). Notably, Delvalle was two years older than Soto (<u>see</u> Dkt. No. 96, at 2) and the same age as Joseph (<u>see</u> Dkt. No. 140, at 3) – both of whom deferred to Delvalle in orchestrating Harris's murder. Perhaps even more salient, Delvalle was nearly the same age as Harris, who was 25 years old and had recently become a father. (<u>See</u> Sent. Tr. 6:4-7; PSR ¶ 20.)

Delvalle makes generalized observations about the cognitive and developmental differences that researchers have purportedly observed in young adults – differences that, Delvalle asserts, make young adults less mature, more impulsive, more "vulnerable or susceptible to negative and outside pressures," and therefore "categorically less culpable" than older adults. (Mot. at 11-13.) Nevertheless, Delvalle fails to show how, in his specific case, his age explains his role in planning and perpetrating Harris's

_____

(which was exacerbated by COVID-19) coupled with an "exemplary record" of rehabilitation during his 20 years in prison).

murder. See Price, 2023 WL 4850995, at *2 n.3 ("Although Price articulates the attributes of youth that courts may consider with respect to compassionate release, he fails to explain how such attributes impacted his own life or decisions."); cf. Gonzalez, 2021 WL 1990041, at *4 (observing that prior cases and available research indicate that "late adolescence" occurs roughly between the ages of 15 and 21 and suggest that the development of "impulse control and the ability to resist peer pressure is quickly nearing its end" by age 24).

Delvalle would be hard-pressed to make such a showing on these facts, in any event. For example, Delvalle relies on United States v. Ramsay, which discussed recent studies showing that "in high-pressure, time-sensitive, emotional contexts ('hot cognition'), adolescents tend to make riskier decisions" than older adults. 538 F. Supp. 3d 407, 420 (S.D.N.Y. 2021). But the court also noted that "[w]hen it comes to academic or deliberative decisions ('cold cognition'), adolescents 16 and older reason about as well as adults." Id. at 419 (observing that "adolescent decision making is situationally dependent"). Thus, the court found that the defendant's actions of "wantonly fir[ing] [gunshots] into a crowd" bore "all the hallmarks of adolescent crime." Id. at 424. Unlike the defendant in Ramsay, Delvalle's actions were not impulsive but were instead the product of calculated

decision-making more characteristic of "cold cognition." See Raposo, 2024 WL 165195, at *7 (distinguishing Ramsay because defendant, in starting deadly fire, "committed deliberate acts – pouring oil on stairs and fire escapes, disabling the fire alarm, and locking the front door with a mortise lock for which only he had the key – that reflected strategic conduct to impede egress and emergency response").

Delvalle next cites a slew of cases that purportedly credited the defendant's youth as a factor in reducing the defendant's sentence. (Mot. at 13-15.) But many of those decisions did not, in fact, involve the defendant's youth. E.g., United States v. Jones, 482 F. Supp. 3d 969, 974 (N.D. Cal. 2020) (raising only COVID-19, changes in sentencing law, and defendant's rehabilitation); United States v. Harris, No. 97 Cr. 399, 2020 WL 7861325, at *1 (E.D. Pa. Dec. 31, 2020) (same). And even in the cases that did consider the defendant's youth, those decisions relied on additional factors that further weighed in favor of a sentence reduction but that are conspicuously absent here.

For example, most of those defendants had already served decades in prison on mandatory life sentences. E.g., United States v. Morris, No. 99 Cr. 264, 2022 WL 3703201, at *1-9, *12 (D. Conn. Aug. 26, 2022) (reducing mandatory life sentence after 18-year-old defendant served 23 years for murder);

United States v. Cruz, No. 94 Cr. 112, 2021 WL 1326851, at *1, *4-7 (D. Conn. Apr. 9, 2021) (reducing mandatory life sentence after 18-year-old defendant served 31 years for two gang-related murders); United States v. Sims, No. 98 Cr. 045, 2021 WL 1603959, at *5-7 (E.D. Va. Apr. 23, 2021) (reducing mandatory life sentence after 21-year-old defendant served 22 years for purchasing guns used by others in armed bank robbery, which resulted in death of teller);[4] see also United States v. McCoy, 981 F.3d 271, 986 (4th Cir. 2020) (reducing several sentences for robberies and accompanying firearms violations where "defendants' relative youth – from 19 to 24 years old – at the time of their offenses . . . [c]ombined with the substantial sentences the defendants already had served at the time of their motions – from 17 to 25 years – [] meant that each defendant had spent close to or more than half his life in prison" (emphasis added)).[5] By contrast,

---

[4] Many of these mandatory life sentences were imposed before the Guidelines were made advisory by Booker v. United States, 543 U.S. 220 (2005) – a fact that appears to have factored into several of these decisions. See, e.g., Cruz, 2021 WL 1326851, at *5 ("At Cruz's sentencing in 1996, the Sentencing Guidelines were mandatory and called for a life sentence. The court was not permitted to consider age as a basis for imposing a sentence outside of the guideline range.").

[5] As Delvalle himself notes (see Mot. at 7), McCoy principally relied on the significant sentencing disparities created by the First Step Act's non-retroactive elimination of "sentence-stacking" under 18 U.S.C. § 924(c) – a sentencing scheme that had exposed defendants to additional mandatory minimums and led to sentences between 35 to 53 years. 981 F.3d at 277; see id. at 285 (holding that "the sheer and unusual length" of defendants' sentences combined with the "gross disparity between those sentences and the sentences Congress now believes to be an appropriate penalty" (including disparities as great as 30 years) were extraordinary

Delvalle moved for a sentence reduction less than two years after sentencing and after serving just six years of his 35-year sentence.

In addition to having already served a considerable portion of their sentences, many of the defendants cited by Delvalle further demonstrated that they had been coerced into committing the relevant offense – a factor exacerbated by the defendants' youth. E.g., Cruz, 2021 WL 1326851, at *1 (finding 18-year-old defendant had repeatedly protested senior gang member's order to participate in killings but was threatened that he would be killed himself if he failed to comply); Morris, 2022 WL 3703201, at *6-9 (finding 18-year-old defendant had been pressured to commit murder by senior members of drug-trafficking organization). In stark contrast to those defendants, Delvalle was the ringleader here.

Second, the Court finds that Delvalle's sentence is appropriate and reflects the seriousness of his conduct. Indeed, Delvalle's sentence is below the sentence he would have faced absent his plea agreement. Delvalle was initially charged with murder in aid of racketeering, which carries a mandatory minimum of life imprisonment, see 18 U.S.C. § 1959(a)(1), and murder in connection with a drug crime,

---

and compelling reasons). As discussed already, Delvalle does not face a sentencing disparity here.

which carries a mandatory minimum of 20 years' imprisonment, see 21 U.S.C. § 848(e)(1)(A). (See Dkt. No. 25.) Facing the prospect of a mandatory life sentence, Delvalle negotiated a plea agreement that capped his maximum sentence at 420 months' imprisonment. In exchange, Delvalle pleaded guilty to narcotics conspiracy and agreed to a Stipulated Guidelines range of 360 to 480 months' imprisonment, with 480 months being the statutory maximum. (See PSR ¶ 3.) As a condition of his plea, Delvalle admitted to his participation in Harris's murder, which he agreed was relevant conduct at sentencing. (See id.; Plea Tr. 26:4-27:1.) Notwithstanding the present Motion, Delvalle agreed not to file a direct appeal or collateral challenge to any sentence imposed within the Stipulated Guidelines range. (See id. 21:2-23.) Far from an "excessively long" sentence, the Court imposed a reasonable sentence squarely within the Stipulated Guidelines range and well below the statutory maximum.

Delvalle contends that his sentence "is more than twice the average sentence for murder." (Mot. at 16 (citing United States v. Lara, 658 F. Supp. 3d 22, 37 (D.R.I. 2023) (finding that "the median federal sentence for murder [in 2021] was 231 months (about nineteen years)").) Even if true, that comparison ignores the aggravating circumstances here that distinguish Delvalle's case from other murders, including

Delvalle's premeditation, his leadership role in the offense, the particularly brutal nature of the attack, and that the murder was committed in furtherance of racketeering and drug conspiracy. Compare (Sent. Tr. 34:5-17 (emphasizing "the depth of the depravity, the callousness, and inhumanity" of Delvalle's conduct as reason for imposing 420-month sentence)), with Lara 658 F. Supp. 3d at 43, 35, 29 (reducing mandatory life-without-parole sentence "predicated on felony murder" that was imposed on "teenage[d] [defendant] whom the jury acquitted of the murder," where defendant was "not the trigger person" but rather played a "subordinate role" to co-defendant who fatally shot victim during carjacking offense).[6] As the Court itself observed at sentencing, Delvalle's sentence is *below* sentences it has previously imposed on other defendants who have committed "heinous crimes of this kind" that involve "aggravated murder" in connection with "drug conspiracies." (Sent. Tr. 34:17-25 (expressing concern that a lesser sentence would result in "an unreasonable and unwarranted sentencing disparity").) Accord Glynn, 2022 WL 562652, at *1 (involving defendant serving mandatory life sentence for murder in aid of racketeering and concurrent

---

[6] Also unlike Delvalle, the defendant in Lara had already served 28 years in prison. See 658 F. Supp. 3d at 25.

480-month sentence for murder in connection with a drug conspiracy).

Finally, Delvalle's clean disciplinary record and rehabilitation efforts do not justify a sentence reduction. BOP confirms that Delvalle has not received any disciplinary infractions since he was sentenced (see Opp. at 9), and Delvalle attaches certificates of achievement attesting to his completion of several rehabilitation and education programs while incarcerated (see Dkt. No. 159, at 20-32.) Yet while Delvalle's "efforts at rehabilitating himself are commendable and should continue, they do not alone or in combination with his other arguments constitute an extraordinary and compelling reason for compassionate release." Sierra, 2024 WL 1834081, at *4; see United States v. Steele, No. 19 Cr. 065, 2021 WL 2138829, at *7 (D. Conn. May 26, 2021) (finding "admirable and promising" rehabilitation efforts not extraordinary and compelling).

B. **Section 3553(a) Factors**

Because Delvalle has failed to demonstrate any extraordinary and compelling reasons, he is not eligible for a sentence reduction. See Sierra, 2024 WL 1834081, at *4. However, even if he had, the Section 3553(a) factors weigh against granting a sentence reduction here. Id. The Court already weighed the same Section 3353(a) factors during

Delvalle's sentencing only two years ago, and Delvalle does not explain why the Court's consideration of those factors should be any different today.

At sentencing, the Court considered the nature and circumstances of the offense, Delvalle's age and personal characteristics, his post-offense and post-arrest conduct, and the length of the sentence including potential disparities. Weighing all of the factors listed in Section 3553(a), the Court found that a 420-month sentence was "reasonable and appropriate and that such a term is sufficient but not greater than necessary to promote the proper objectives of sentencing." (Sent. Tr. 32:14-20.) The Court explained that this sentence took into account "the depth of the depravity, the callousness, and the inhumanity that was involved" in the murder, as well as the impact of the crime on the victim's family and "the damage that such serious conduct and crime causes to society as a whole." (Id. 34:5-17.) The Court also considered the sentences imposed on defendants who had "commit[ted] heinous crimes of this kind" involving "serious aggravated murder . . . as part of drug conspiracies," and found that a shorter sentence would result in "an unreasonable and unwarranted sentencing disparity" between Delvalle and those defendants "who have been

sentenced by this Court to life in jail for conduct as severe as that of Mr. Delvalle." (Id. 34:17-35:10.)

All of these factors still apply with equal force today, and Delvalle offers no reason here that would disrupt the Court's findings. He cites his criminal history category of I, which he claims shows he lacks "any substantial criminal history." (See Mot. at 17.) But the Court already accounted for Delvalle's criminal history when sentencing him within the Sentencing Guidelines range of 360 to 480 months' imprisonment – a sentencing range that was calculated, in part, based on Delvalle's criminal history category. Delvalle argues that "[i]t would be improper for the Court to focus its § 3553(a) analysis based on [his] presentence conduct" because that does not "account for the astounding progress he has made in the past several years." (Mot. at 18.) But the Court already assessed Delvalle's post-arrest conduct and rehabilitation, as he had spent approximately four years at MDC before sentencing. (See Sent. Tr. 27:3-9.)

Delvalle claims that his clean disciplinary record and demonstrated efforts at rehabilitation since sentencing indicate that he is less likely to recidivate and thus presents a "low risk of danger to the community." (Mot. at 17-18.) This argument might have more force had he already served a substantial portion of his sentence, as opposed to

less than 18 percent. Cf. United States v. Underwood, No. 88
Cr. 822, 2021 WL 3204834, at *3 (S.D.N.Y. Jan. 15, 2021)
(crediting "strong evidence that [defendant] has been fully
rehabilitated" after serving 33 years in prison without "a
single disciplinary infraction"); Harris, 2020 WL 7861325, at
*1, *14 (crediting defendant's "extensive rehabilitation"
after serving over 23 years in prison, including 13 years
since his last disciplinary infraction). While the Court
"commends" Delvalle's efforts at rehabilitation, this
consideration does not "compel a reduction here given the
serious nature and circumstance of the offense[] for which
[he] was sentenced." Price, 2023 WL 4850995, at *5.

Put simply, the Court is not persuaded by Delvalle's
attempts to relitigate the sentence imposed less than two
years ago. For the same reasons identified at sentencing, the
Court finds that reducing Delvalle's sentence would
disserve the objectives of Section 3553(a).

*****

In sum, Delvalle cannot satisfy the strict standard
necessary to grant a motion for reconsideration. The only
issues before the Court on reconsideration are arguments
Delvalle already raised in his motion for compassionate
release. And though the Order did not then address each of
those arguments, the Court's analysis above demonstrates that

none of the circumstances raised by Delvalle "alter[s] the conclusion" that he does not warrant a sentence reduction. <u>Fishman</u>, 2023 WL 5432263, at *2. Accordingly, Delvalle has failed to show that reconsideration is necessary "to correct a clear error or prevent manifest injustice." <u>Reese</u>, 2022 WL 7541864, at *1. The Motion must therefore be denied.

### IV.  <u>ORDER</u>

For the reasons stated above, Delvalle's Motion for Reconsideration (Dkt. No. 165) is **DENIED**.

The Clerk of Court is respectfully directed to close the pending motion at Dkt. No. 165, to mail a copy of this Order to Kevin Delvalle, Register Number 28001-055, McKean FCI, 6975 Route 59, Lewis Run, Pennsylvania 16738, and to note service on the docket.


**SO ORDERED.**

Dated:    23 August 2024
          New York, New York

                                        Victor Marrero
                                        U.S.D.J.

24